742 So.2d 215 (1999)
Richard Earl SHERE, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 91614.
Supreme Court of Florida.
June 24, 1999.
*216 James H. Walsh, Assistant CCRC and Harry P. Brody, Assistant CCRC, Office of the Capital Collateral Regional Counsel-Middle, Tampa, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
Richard Earl Shere appeals the denial of his motion for postconviction relief filed pursuant to Florida Rules of Criminal Procedure 3.850. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the following reasons, we affirm the denial of Shere's 3.850 motion for postconviction relief.

PROCEEDINGS TO DATE
In 1989, Shere was convicted for the first-degree murder of Drew Paul Snyder. The facts in this case are set forth in greater detail in Shere v. State, 579 So.2d 86 (Fla.1991). There was evidence at trial that Bruce Demo, an acquaintance of Shere, telephoned Shere shortly after midnight on the morning of December 25 advising Shere that he planned to kill Snyder and that he would kill Shere if he did not cooperate. At about 2:30 a.m., Shere went to Demo's house, where they smoked marijuana and drank beer. After loading a shovel into Shere's car, they talked Snyder into going rabbit hunting.
There was contradictory testimony as to what happened during the hunt. Shere maintained that at one point, he placed his.22-caliber rifle on the roof of the car while he went to relieve himself. Suddenly, he heard the weapon discharge and dropped to the ground. When the shooting stopped, he saw that Snyder had been shot. He wanted to take Snyder to the hospital, but before he was able to do so, Demo shot Snyder twice more in the head and the chest. They both then buried the body.
Detective Alan Arick contradicted Shere's accounts. He testified that Demo had told him that it was Demo who had gone to relieve himself. When he heard a shot and turned around, Demo saw Shere fire five or six shots at Snyder. Shere then ordered Demo to finish Snyder off. Ray Pruden, a friend of Shere, also contradicted Shere's accounts. He testified that one night after Christmas, Shere had told him he had killed Snyder while out rabbit hunting and had buried his body. Forensic evidence established that shots were fired in Shere's car and that human blood was found on Shere's boots.
*217 After convicting Shere, the jury recommended death by a vote of seven to five. The trial judge followed the jury's recommendation and sentenced Shere to death, finding three aggravating factors[1] and one statutory mitigating circumstance.[2] This Court affirmed Shere's conviction and sentence.[3]
On February 1, 1993, Shere filed his initial postconviction motion. This motion was stricken because it was unsworn and legally insufficient. Subsequently, on July 12, 1993, Shere filed a new motion asserting twenty-three claims. The trial court conducted a Huff[4] hearing on September 13, 1996, and on June 4, 1997, it held an evidentiary hearing to consider claims III (to the extent that it overlapped with claims IV, VI, and XV), IV, VI, and XV.[5] In an Order Denying Defendant's Motion for Postconviction Relief [hereinafter "Order"] dated August 13, 1997, the trial judge summarily denied all claims except III to the extent mentioned above, IV, VI, and XV, which were all denied on their merits pursuant to the evidentiary hearing. This appeal is from that order.

APPEAL
Shere raises several issues on appeal which we must consider, the majority of which deal with ineffective assistance of counsel at the guilt and penalty phases of the trial.[6] The remaining issues raised *218 on appeal are either procedurally barred[7] or without merit.[8]

INEFFECTIVE ASSISTANCE AT THE GUILT PHASE
In order to establish ineffective assistance *219 of counsel, a defendant must prove two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Rutherford v. State, 727 So.2d 216 (Fla.1998); Rose v. State, 675 So.2d 567 (Fla.1996); Wilson v. Wainwright, 474 So.2d 1162 (Fla.1985); Johnson v. Wainwright, 463 So.2d 207 (Fla.1985). In determining deficiency, "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. 2052; see also Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995). Moreover, counsel's deficiency prejudices defendant only when the defendant is deprived of a "fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
Shere raises several claims based on ineffective assistance of counsel at the guilt phase. Some of these are procedurally barred,[9] but others merit discussion. Shere asserts that defense counsel was ineffective for calling Detective Arick as a defense witness because his testimony opened the door for the State to draw from the detective the portions of Demo's statements that conflicted with Shere's account, statements that the jury otherwise would never have heard. After a review of the proceedings below, we can find no error in the way the trial court dealt with this issue in its order. It provided in relevant part:
The record of the trial and the testimony presented during the evidentiary hearing clearly establish that the decision to offer evidence of the codefendant's admissions regarding his own involvement in the murder was a tactical judgment on the part of defendant's trial counsel. At the conclusion of the State's *220 case the defendant was in a desperate situation. Although the defendant blamed the murder on his codefendant in his statement to law enforcement, the State also introduced evidence at trial that the defendant gave several inconsistent statements after his arrest. The State also established that the defendant told his girlfriend [Heidi Greulich] that he had killed the victim himself and that he told a friend, Ray Pruden, that he had shot the victim "ten or fifteen times," that he had buried the victim "where nobody would find him," and that the defendant had made no mention of any involvement by the codefendant. The physical evidence, including projectiles removed from the victim's body that came from defendant's gun, was extremely damaging. The State's case-in-chief did not leave any doubt that the defendant played a major role in the murder and subsequent coverup. It is likely that nothing the defendant or his attorneys could have done at that point would have avoided a conviction for first-degree murder. They had a choice of resting and reserving their right to opening and closing final arguments, or of mounting some kind of defense, weak as it was. Other than the order of final arguments, defendant did not have anything to lose.
If counsel had made a careless or unconcerned decision to introduce the evidence, the court would be concerned. The court would also be concerned if the decision was made by an uninformed and inexperienced attorney. However, defendant was represented by a highly competent and ethical trial attorney who has dedicated his life to defending people who are charged with crimes. He was assisted in trial by an excellent associate. He had the benefit of advice from a highly experienced investigator and experienced attorneys working in his own office. They had the assistance of a reliable mental health professional that his office uses in many cases. They investigated every avenue of defense and mitigation suggested by the evidence, and all information they were furnished by the defendant, his family, his wife, and the psychologist.
Counsel made the tactical decision after considering all of the evidence against his client and after considering all other alternatives. See State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987) ("Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected"). Although this strategy may appear futile, this court has seen weaker arguments prevail in front of a jury of untrained citizens. Finally, the fact that introducing portions of the codefendant's statement opened the door to other inculpatory evidence was not of much consequence given the fact that the defendant's statements to law enforcement and his friends were already before the jury and those statements portrayed him as a cold and ruthless killer.
The court finds that the defense attorney's decision to introduce the codefendant's statements was not "a clear, substantial deficiency" that was "outside the broad range of reasonably competent performance under prevailing professional standards." Maxwell, 490 So.2d at 932. The codefendant's statement confirmed that he fired the fatal shot and that the defendant did not act alone. The defense believed these facts would mitigate against a conviction of first-degree murder and more importantly, against a recommendation of death. Also, no matter how the defendant or his attorneys tried to rationalize his involvement in the crime, there was overwhelming evidence that the defendant was guilty of first degree murder. The defendant did not prove that his attorneys' strategy prejudiced the outcome of the trial or that it "so affected the fairness and reliability of the proceeding *221 that confidence in the outcome is undermined." Maxwell, 490 So.2d at 932.
Order at 9-12 (citations omitted).[10]
At the evidentiary hearing, defense counsel testified concerning his decision to call Detective Arick as a witness: "No, it was not a mistake. It may have turned out to be a mistake, but at the time of trial, I thought it was right." This testimony is important because
[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.
Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (citation omitted); see also Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995) (concluding standard is not how current counsel would have proceeded in hindsight). Moreover, as referenced by the trial court, defense counsel specifically testified that although he consciously recognized Demo's statements were a double-edged sword, he believed that Demo's statement confessing to firing the fatal shot and confirming that Shere did not act alone would mitigate against a conviction of first-degree murder and a recommendation of death in Shere's case.
Shere also argues that counsel's decision prejudiced him because it damaged his credibility before the trial judge and the jury. However, the record, and in particular Detective Arick's testimony on direct examination as a State witness, show that counsel was handicapped by the fact that Shere had completely changed his story. When first questioned by police, Shere said that he knew nothing about the murder. Upon further questioning, however, he testified to the accounts of what had transpired and led police to the buried body and the weapon used in the murder. As such, his credibility before the judge and jury had already been damaged. Therefore, we conclude that the trial court's factual findings and legal conclusion that counsel's decision was a tactical one that did not constitute ineffective assistance of counsel does not constitute reversible error.
Shere also argues that defense counsel was deficient in failing to act as an advocate. Except for Shere's claim that defense counsel pressured him into deciding not to testify, the remaining claims raised under this heading are procedurally barred because they were raised for the first time on appeal. See Doyle, 526 So.2d at 911.[11] Again, the trial court comprehensively dealt with Shere's claim in its order:

*222 Defendant's trial attorneys testified that they allowed the defendant to make the final decision on whether he should testify in the guilt stage of the trial. They counseled with him on this issue on many occasions, even arranging a mock direct and cross examination to illustrate the problems with his testimony. The defendant was an erratic and difficult client who insisted on repeatedly changing his version of the murder. He even told Dr. James Larson, the expert he retained for the R. 3.850 proceedings, different versions of what happened that evening. His attorneys, their investigator, and the Chief Assistant Public Defender advised the defendant against testifying. That advice was a reasonable, tactical decision that was in the realm of counsel's professional judgement-not ineffective assistance of counsel.
Before the defense rested the attorneys consulted with the defendant again and advised him that the time had come to decide whether to testify. He agreed that he would not.
As a result of the defendant's comments to this court at the conclusion of the penalty phase of the trial both of defendant's attorneys prepared written memoranda of law concerning the details of their discussion with the defendant regarding the issue of the defendant testifying during the guilt phase of the trial. The documents, prepared shortly after trial, are consistent with each other and the attorneys' testimony in the R. 3.850 hearing. The defendant's testimony during the R. 3.850 hearing was not credible. Furthermore, he did not present any specific evidence or argument to show how his testimony in the guilt phase would have improved his chances of being found not guilty of first-degree murder.
Order at 7-8.
As further proof that defense counsel was deficient in this regard, Shere points out that defense counsel testified at the evidentiary hearing that Shere did not understand the decision of whether or not to testify. However, this statement was made by co-counsel, Ms. Buckingham Toner, the attorney who sat as second chair during the trial, and must be examined in the broader context of her entire testimony. Immediately before the cited statement, Ms. Buckingham Toner testified that she thought Shere understood he had a right to testify or not testify, but obviously he did not know all the different nuances of the different cases or sophisticated legal strategy in the courtroom. This language appears to refer to the understandable difficulty of any person's ability to know the rules of evidence and the effect of the testimony on the outcome of the trial, rather than to any unique or specific unreasonable inability of Shere. As noted above, we find that the trial court adequately analyzed this issue and we find no error.

INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE
Shere alleges that defense counsel was deficient in failing to call Dr. Fisher to testify during the penalty phase as to the possibility of Shere suffering from manic disorder or the possibility of organic brain damage evidenced by headaches he complained of as a result of a childhood head injury.[12] At the hearing, Ms. Buckingham *223 Toner, the attorney responsible for the penalty phase of the trial, testified that she had found out about Shere's childhood head injury and subsequent headaches when she interviewed his family members in preparation for the penalty phase and in turn told Dr. Fisher about it.[13] Dr. Fisher told Ms. Buckingham Toner about the possibility of manic disorder and informed her about the symptoms to look for as she further interviewed members of Shere's family. However, she testified that the family members discussed no symptoms evidencing the possibility of manic disorder.
She further testified that manic syndrome was not the primary theory she was trying to develop in the penalty phase. Instead, she was trying to portray Shere as a follower and not a leader, as a good child, and as a person who had experienced great emotional problems as a result of his parents' divorce. She was also trying to show his drug and alcohol abuse. Moreover, she testified she thought her credibility before the jury would be tainted if she argued Shere's headaches to the jury as mitigators, headaches that had allegedly stopped after Shere had moved many years before to Hernando County. She further stated that it was not a mistake not to present Shere's head injury. On cross-examination, she stated that if the headaches had continued after he moved to Hernando County, she might have been more likely to present the headaches as a theory of mitigation because they could be more easily believed to have been the result of his head injury rather then the result of emotional problems. At the evidentiary hearing, Shere presented Dr. James Larson, who testified that, based on the evidence before him then, it would have been prudent to have ordered neuropsychological testing for Shere.
In its order rejecting the claim of ineffectiveness for not investigating or developing further mental mitigation, the trial court stated:
The defendant urges the court to find that trial counsel was given evidence of defendant's "severe head injury as a youth and his subsequent headaches" (defendant's proposed order on R. 3.850 hearing) and even though they had that evidence, failed to request a neuropsychological or neurological exam by a qualified expert and further investigate the case. That claim is not supported by the evidence.

*224 The defendant did not report any head injuries that resulted in unconsciousness to his attorneys or to Dr. Fisher that would have alerted them to make further investigation. Even in his interview with Dr. Larson, the defendant did not report any loss of consciousness. It is inconceivable that defendant would not know this fact.
The need for further evaluation rests solely on the accuracy of new evidence from defendant's family that he fell from the top of a 30 foot backstop and was knocked unconscious. The court did not give that evidence any credibility because the defendant's description of the event is substantially different. Also, the timing of this report and the lack of any supporting medical records are additionally [sic] evidence that the report is not completely true.
The defendant's general claims that he was denied effective assistance of counsel in the penalty phase of the trial are not supported by the evidence. The defendant's trial attorneys tried to develop statutory and non-statutory mitigating circumstances by diligently investigating the defendant's background. Based on what they were told by the defendant and his sister they developed a theme that the defendant was a kind, gentle, God-fearing man, who suffered emotionally as a result of his parents' divorce and who was a follower by nature. They presented that evidence to the jury. The fact that the jury, and this court, failed to find that evidence of sufficient weight to recommend a life sentence does not establish that the defendant's trial counsel were ineffective. The evidentiary hearing testimony of the defendant's mother, father, and sister was not materially different than the evidence of mitigation presented to the jury. Also, their testimony that the defendant was a chronic drug and alcohol abuser is, if true, less mitigating than the evidence presented to the jury and contrary to the defendant's own statements that neither drugs, nor alcohol played any part in the offense. More importantly, the new version of events offered by the family would not have caused the jury to change its recommendation or this Court to change its sentence.
Order at 22-24. We find that the trial judge's factual findings are supported by competent substantial evidence. Further, we note that, unlike most cases where we have held trial counsel ineffective for failing to investigate and present mitigating evidence, Shere has provided no new expert who can testify directly on the issue of the alleged mental conditions suffered by him that would support mitigating circumstances. See, e.g., Rose, 675 So.2d at 571. In fact, even though the new expert, Dr. Larson, testified at the hearing that it was possible that statutory mitigating circumstances existed, the trial court found that he could not specifically address any mitigating circumstances or establish a basis for his opinion. Thus, we conclude that the trial court's legal conclusions are supported by our prior opinions. See, e.g., Rutherford v. State, 727 So.2d 216, 223-25 (Fla.1998); Haliburton v. Singletary, 691 So.2d 466, 471 (Fla.1997).

CONCLUSION
In sum, we affirm the trial court's denial of all the claims raised by Shere in this appeal of his motion for postconviction relief.
It is so ordered.
HARDING, C.J., SHAW, WELLS, ANSTEAD, PARIENTE and LEWIS, JJ., and OVERTON, Senior Justice, concur.
NOTES
[1] These factors were: (1) the murder was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws by eliminating a witness; (2) the murder was especially evil, wicked, atrocious or cruel; and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
[2] The only statutory mitigator the trial court found was that Shere was twenty-one years old when Snyder was murdered. As to non-statutory mitigating circumstances, the trial court summarized the evidence but did not find any, concluding that the only appropriate sentence was death.
[3] Although we found that the trial court erred in calling Shere's wife to testify as a court witness and in finding that the murder was committed in an especially heinous, atrocious or cruel manner, we found these errors harmless and upheld the conviction and death sentence. See Shere v. State, 579 So.2d 86 (Fla. 1991).
[4] Huff v. State, 622 So.2d 982 (Fla.1993).
[5] Claim III asserted ineffective assistance of counsel at the penalty phase of the trial; claim IV asserted ineffective assistance of counsel during voir dire; claim VI asserted ineffective assistance of counsel during the pretrial stages and guilt phase portions; and claim XV asserted that counsel was ineffective for failing to provide a mental health expert to evaluate Shere.
[6] In a heading in his brief, Shere asserts that the trial court erred by summarily denying nineteen of the twenty-three claims raised in his 3.850 motion. However, for most of these claims, Shere did not present any argument or allege on what grounds the trial court erred in denying these claims. We find that these claims are insufficiently presented for review. See State v. Mitchell, 719 So.2d 1245, 1247 (Fla. 1st DCA 1998) (finding that issues raised in appellate brief which contain no argument are deemed abandoned), review denied, 729 So.2d 393 (Fla.1999). Shere also raises an ineffective assistance of postconviction counsel claim. Shere argues that although postconviction counsel filed twenty-three claims, he failed to prove these claims and was deficient in his overall performance at the evidentiary hearing.

However, ineffective assistance of counsel claims must be raised in the court in which the alleged ineffectiveness occurred, not on the appeal of the denial of Shere's 3.850 motion. See generally Knight v. State, 394 So.2d 997 (Fla.1981); Richardson v. State, 624 So.2d 804 (Fla. 1st DCA 1993); Turner v. State, 570 So.2d 1114 (Fla. 5th DCA 1990). Moreover, we have not recognized ineffective assistance of postconviction counsel claims. See Lambrix v. State, 698 So.[2d] 247, 248 (Fla.1996) (citing Murray v. Giarratano, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989), and Pennsylvania v. Finley, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)), cert. denied, 522 U.S. 1122, 118 S.Ct. 1064, 140 L.Ed.2d 125 (1998).
[7] Shere claims that the trial court's error in calling Heidi Greulich as a court witness was reversible error. This claim is procedurally barred because that issue was raised and decided adversely to Shere on direct appeal. See Shere v. State, 579 So.2d 86, 94 (Fla. 1991). Furthermore, Shere's claim challenging the sufficiency of this Court's harmless error analysis on direct appeal cannot be raised in this motion for postconviction relief.

Shere also argues that credible trial evidence contradicts most of the court's findings on aggravators and mitigators. To the extent Shere challenges the jury instructions given on the aggravators, the postconviction court correctly found these claims procedurally barred because they should have been raised on direct appeal. See Jackson v. State, 648 So.2d 85, 90 (Fla.1994).
With regard to the CCP aggravator, we upheld its application to this case on direct appeal, see Shere v. State, 579 So.2d 86, 95 (Fla.1991); therefore, Shere is precluded from relitigating this claim in his 3.850 motion. See Jones v. Dugger, 533 So.2d 290, 292 (Fla.1988).
Shere also alleges that the statutory aggravator of hindering or disrupting the lawful exercise of a government function of law enforcement is not supported by the evidence. In his rule 3.850 motion, Shere only alleged that the jury was improperly instructed on this aggravator, a claim the court found procedurally barred pursuant to Hardwick v. Dugger, 648 So.2d 100, 103 (Fla.1994). Therefore, Shere cannot raise the sufficiency of the evidence for the first time on appeal. See Doyle v. State, 526 So.2d 909, 911 (Fla. 1988). Moreover, Shere would be procedurally barred from raising this claim because on direct appeal we held that this aggravator was supported by the evidence. See Shere, 579 So.2d at 95.
Shere argues that the court gave inadequate consideration to Shere's age and lack of a prior adult criminal record. These claims are also procedurally barred because they should have been raised on direct appeal. In fact, Shere did raise the issue of prior adult criminal record on direct appeal. Moreover, in his sentencing order, the trial judge specifically noted that Shere was on pretrial release pending trial on burglary and robbery charges and by his own admission, was selling illegal drugs at the time of the murder. We upheld these findings in Shere, 579 So.2d at 95.
Shere's next claim is that there can be no procedural bar to any claim in a case in which the death penalty has been imposed. This claim too is procedurally barred because it was not raised in the 3.850 motion. See Doyle, 526 So.2d at 911. Notwithstanding, the claim is without merit because this Court as well as the federal courts have repeatedly imposed procedural bars to untimely filed or previously litigated claims. See, e.g., Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); Rivera v. State, 717 So.2d 477 (Fla.1998).
As his final claim, Shere asserts that Florida's death penalty statute is unconstitutional as applied to him based upon the credible and material factual evidence presented throughout the judicial proceedings and because of the aggravators that were improperly applied to him. He claims that at most the evidence reflected that Shere was an accessory, an unwilling and threatened participant. This claim is procedurally barred and, in the alternative, without merit. Shere has already litigated the sufficiency of the evidence presented at trial and has had that decision reviewed by this Court. See Shere. Moreover, Shere is also barred because he did not raise this claim in his 3.850 motion. See Doyle, 526 So.2d at 911. To the extent that Shere argues that the death penalty is cruel and unusual punishment, that claim is controlled by Jones v. State, 701 So.2d 76 (Fla.1997), cert. denied, 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 335 (1998), and is without merit.
[8] Shere also asserts that the trial court's findings of fact and conclusions of law in the postconviction trial court order are not supported by the record and evidence presented at the evidentiary hearing. To the extent Shere is challenging the propriety of the judge's findings, this claim is without merit. As pointed out by the State, the role of the trial judge in an evidentiary hearing is to make credibility determinations and findings of fact, which is clearly what the judge did in this case. His findings that Shere changed his accounts of the murder were supported by the evidentiary hearing record because Dr. Larson testified that Shere had told him two different accounts of his participation in the murder.

Shere also claims that this Court erred in applying a harmless error analysis because such an analysis is not applicable in death penalty cases. This claim is also without merit because both the United States Supreme Court and this Court have repeatedly conducted harmless error analysis in death cases. See, e.g., Hitchcock v. Dugger, 481 U.S. 393, 399, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); Bottoson v. State, 674 So.2d 621 (Fla. 1996).
Shere alleges that the evidentiary hearing judge, who was also the trial court judge, relied on unverified recollections of trial testimony and thus confused matters of one proceeding with the other. He does this by pointing out three technicalities in the evidentiary hearing order-i.e., trial court's referral to Demo as Shere's codefendant when in fact they were not tried together, which is the context for which this term is usually reserved. We find no merit to these allegations. Moreover, after an examination of the record, we find that any error committed by the trial court in this context does not constitute reversible error.
[9] Shere claims that defense counsel was deficient for failing to impeach Demo through other witnesses once the jury heard his allegations accusing Shere of the murder, and for failing to cross-examine Ray Pruden and Heidi Greulich, two witnesses who testified that Shere had confessed to the murder. This claim is procedurally barred because it should have been raised in Shere's rule 3.850 motion, not for the first time in this appeal. See Doyle v. State, 526 So.2d 909, 911 (Fla.1988).

Shere also asserts that if defense counsel had only provided the jury and the court with Shere's uncontroverted version of the occurrences introduced by the State in Detective Arick's taped interrogation, an acquittal would have resulted because the State's case rested on tenuous evidence at best. However, this claim is also procedurally barred because it is raised for the first time on this appeal. See id. Nevertheless, even if this claim were not procedurally barred, it would fail on its merits because it is merely second-guessing defense counsel's trial strategy, clearly not the applicable standard for an ineffective assistance of counsel claim. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052; Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995).
[10] Shere claims that the evidentiary hearing court erred by relying on Heidi Greulich's testimony to support its findings after we had found the introduction of her testimony to be error on direct appeal. As is evident from the above-quoted portion of the trial court's order, the court relied on Greulich's testimony to substantiate the evidence that was presented against Shere. Shere is correct that the trial court erred in relying on Heidi Greulich's testimony in his order because on appeal, we had found the court's decision to call her as a witness to be error, albeit harmless. See Shere, 579 So.2d at 94. However, this error did not render the evidentiary hearing court's finding inadequate. In its order, the trial court relied on other inculpatory evidence. For example, it cited Shere's statements to Pruden and the effect of the physical evidence in the case. This was the same evidence we used in our decision to find the trial court's error harmless. See id. at 90. Therefore, while we agree it was error for the trial court to rely on Greulich's testimony, it did not constitute reversible error.
[11] These claims include assertions that defense counsel had disdain for Shere and that he had testified that Shere was a liar and that the evidence at the close of the State's case indicated that Shere had committed the murder. Moreover, Shere alleges that defense counsel abrogated his duty by shifting the burden of picking the jurors in the case to Shere.
[12] Shere's remaining claims on this issue are clearly without merit or procedurally barred. Shere also alleges that trial counsel was ineffective because through greater due diligence, counsel could have established that the CCP aggravator was not established beyond a reasonable doubt. However, Shere does not allege the due diligence through which counsel could have proved this. In fact, the only allegation made by Shere on this issue is that the trial court erred in finding that Shere and his accomplice had planned the murder several hours before the actual killing. Moreover, the evidence found by the trial judge at the hearing is part of the same evidence that this Court relied on to uphold the CCP finding on Shere's direct appeal. Shere is clearly attempting to relitigate the merits of the CCP finding by couching it in terms of an ineffective assistance of counsel claim. See Medina v. State, 573 So.2d 293, 295 (Fla.1990) (stating that claims of ineffective assistance of counsel should not be used to circumvent the rule that postconviction proceedings cannot serve as a second appeal). Therefore, this claim is insufficiently pled and, in the alternative, without merit.

Shere also argues that counsel failed to present and argue the following nonstatutory mitigators: (1) Shere's cooperation with authorities; (2) Shere's abandonment of the crime as established by his requests to take the victim to the hospital; (3) Shere's passivity; and (4) his efforts to dissuade Demo from his homicidal desire. This claim also appears to be procedurally barred because it was not raised in the 3.850 motion. See Doyle, 526 So.2d at 911. Nevertheless, it appears that this claim would not satisfy the two-prong test enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Although Shere did assist the police by leading them to the victim's body and the crime scene, Shere had previously denied having any knowledge or involvement with the crime. Moreover, the only evidence of his abandonment of the crime and efforts to take the victim to the hospital and dissuade Demo from committing the murder is through his own self-serving statements. Assuming that defense counsel was deficient in not presenting this evidence, we find that such nonstatutory mitigating evidence would not have materially affected the jury's recommendation.
[13] We recognize that Ms. Buckingham Toner had never before tried a first-degree murder case. However, although we can and should consider this as a factor in the effectiveness of counsel's representation, we have rejected treating it as a presumption of ineffectiveness. See Remeta v. Dugger, 622 So.2d 452, 454 (Fla.1993).